180 Cal.App.4th 254 (2009)
THE PEOPLE, Plaintiff and Respondent,
v.
ETHAN SALEEM, Defendant and Appellant.
No. B204646.
Court of Appeals of California, Second District, Division Three.
December 17, 2009.
*258 Gerald Peters, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Lance E. Winters and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
KLEIN, P. J.
Defendant and appellant, Ethan Saleem, appeals the judgment entered following his conviction for possession of body armor by a person previously convicted of a violent felony, with prior serious felony and prior prison term findings (Pen. Code, §§ 12370, 667, subds. (b)-(i), 667.5).[1] He was sentenced to state prison for a term of eight years.
We reverse Saleem's conviction. Section 12370 is unconstitutionally void for vagueness because it does not provide fair notice of which protective body vests constitute the body armor made illegal by the statute.

BACKGROUND
Viewed in accordance with the usual rule of appellate review (People v. Ochoa (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established the following.

*259 1. Saleem's arrest.

On January 23, 2007, about 3:00 a.m., Los Angeles Police Officer Jeffrey Rivera and his partner were on patrol in Wilmington. Rivera was in the passenger seat of their marked patrol car. He saw an approaching vehicle make a quick right turn and pull off to the side of the road. Because this seemed suspicious, the officers circled the block and came to a stop next to a Honda Element. The Honda's engine was running and it was parked just about where Rivera had seen the vehicle pull over. Shining their lights on the Honda, the officers saw the driver try to hide himself by reclining his seat. Two people in the backseat suddenly popped into view and one of them started reaching underneath the car seat. This was defendant Saleem. Rivera ordered everyone to exit the Honda.
Saleem did not immediately respond and Rivera had to repeat his order four or five times. After he got out of the Honda, Saleem had to be told three or four more times to step onto the curb with his hands up. When Saleem began walking away from the officers, Rivera again ordered him to put his hands up and turn around. Saleem took five or six steps, then stopped and turned around. At that point, Rivera could see Saleem was wearing "a camouflage vest" similar to the "ballistic" or "bulletproof" vests Rivera had worn while he was deployed in Iraq with the Marines. Over the vest, Saleem was wearing an unbuttoned shirt.
As a matter of officer safety, Rivera immediately alerted his partner to Saleem's vest. Both officers drew their guns, pointed them at Saleem, and ordered him to the ground. Saleem complied with this order only after it had been repeated two or three times. Finally, he got down on his knees and put his hands up. Rivera searched under the seat where he had seen Saleem reaching, but he did not find anything illegal. Saleem told the officers he was on parole for voluntary manslaughter.

2. Officer Rivera's testimony about the vest.

Rivera testified Saleem's vest weighed about 10 pounds. A label on the vest said "[b]ody armor, fragmentation protection vest for ground troops." Behind the label was a pamphlet addressing "the use and care of body armor fragmentation protection vest, ground troops . . . ."
During his time in the military, Rivera had participated in the testing of flak jackets similar to Saleem's body vest: "[T]he vest was placed on a dummy, and we were able to fire various types of rounds at [it], and we were also able to observe the different capabilities of the vest and what rounds it's able to withstand." Based on that experience, Rivera opined Saleem's vest would protect against pistol rounds, such as .22, .38, .40 and .45 caliber, and nine millimeter.

*260 3. The body armor expert's testimony about the vest.

Los Angeles Police Officer Richard Kehr, a subject matter expert in ballistics and body armor, is one of 20 people nationwide on the Body Armor Technology Working Group for the National Institute of Justice (NIJ), a federal organization concerned with standards and testing procedures for ballistics and body armor. Kehr testified the NIJ currently recognizes four basic levels of body armor protection and that the Working Group was in the process of raising the NIJ minimum standards.
Kehr testified the protection provided by any particular body armor depends on such factors as the number of its layers of protective material, its stitch pattern, its weave pattern, and the "type of rounds they're trying to stop . . . ." Concealable body armor is designed to stop handgun fire but not rifle rounds, which require a hard armor plate. Kehr testified the testing of body armor is a very technical process that is not as simple as shooting at a dummy wearing a vest: "When it comes to the actual testing of the body armor, we have that done either at NIST [National Institute of Standards and Technology] or at . . . two independent test labs. I don't have the [facility] and means to do the ballistic testing at our department . . . . To test body armor you have to have a special type of clay, it has to be certain size box, it has to be at a certain temperature and humidity, and then you have to calibrate it before you can test it." "They do six shot tests on it, four shots done directly straight into it and two of them are done at a 30 degree angle. After each shot, they measure the back face signature . . . [i.e.,] the amount of dent that goes into the clay from after the round hits. The maximum amount allowed is 44 millimeters. Anything outside the 44 millimeters is considered a . . . vest failure."
Kehr initially examined Saleem's vest without cutting it open. He checked its weight and the flexibility of its interior material. He testified the vest was "fairly heavy compared to a standard concealable body armor, it's pretty rigid. Usually . . . the more rigid the vest is, the higher the threat it can stop. This vest is a fragmentation vest. Fragmentation vests are designed to stop shrapnel you have usually from IED's,[2] mines, grenades, things of that nature, and typically they're designed just to do that and not to stop ballistic ammunition, handgun rounds. [¶] But by the weight of this vest and everything, I believe that there are certain rounds that it would be able to stop, without a problem."
Kehr also testified about what he found when he subsequently cut open the lining of the vest to examine its insides: "It confirmed my belief that this vest *261 would have some ballistic capabilities. It's got eight layers of an aramid material. . . . [¶] . . . Kevlar is an aramid material. The rigidity on there, the type of pattern on the weave, looks consistent to other materials that I have seen and examined. And based on that, I believe it has some ballistic capabilities."
As for the vest's ability to protect against specific types of ammunition, Kehr explained how such factors as a bullet's composition, shape, weight, jacketing, and velocity will determine a body vest's degree of ballistic resistance. For example, discussing whether Saleem's vest would resist.22-caliber ammunition, Kehr testified: ".22 caliber [long rifle high velocity] bullets are 40 grain, a lot of them are made of lead. Lead being soft, it's easy to mushroom out. [¶] . . . [T]he design of body armor is to take a round and deform it, mushroom it out, making it a wider surface area. The wider surface area, the harder it is to get through and break the tensile strength of the micro filament. Lead being soft, it will mushroom out .22-caliber long rifle rounds ranging anywhere from 1,050 feet per second up to approximately 1,550 to 1,600 feet per second. [¶] 22 magnum rounds, they're usually around 1,875 feet per second. I doubt seriously this vest would be able to stop that type of ammunition. Those have usually a metal jacket around it. Even though it's a 40 grain, it will maintain its shape and keep its roundness. [¶] Ammunition comes in various designs, some are hollow point, some are round nose, some are flat nose. With that type of round, at that velocity, maintaining its shape, I seriously doubt this vest would be able to stop that."
Kehr opined Saleem's vest would protect against .22-caliber long rifle high velocity rounds, .38-caliber hollow-point rounds, jacketed soft point .357 Magnum rounds, nine-millimeter rounds and .45-caliber hollow-point rounds. However, Saleem's vest would not protect against two other types of handgun ammunition: a .22-caliber Magnum round with a metal jacket, or a full metal jacket .357 Magnum round. Nor would it protect against rifle ammunition. The following colloquy then occurred:
"Q Officer Kehr, does this vest meet your definition, the definition you understand as an expert . . . in the field of body armor, does this vest meet your definition of what body armor is?
"A It has some capabilities for a bullet resistant vest, yes."
Kehr testified the pamphlet found inside Saleem's vest stated: "This vest does not protect you against small arms fire. It may tend to decrease the severity of wounds . . . from rifles and machine guns and will sometimes stop small arms fire that hit from an angle, or if the slug has low velocity." (Italics added.) Kehr testified the pamphlet did not change his opinion that Saleem's *262 vest provided some ballistic resistance because, in military parlance, "small arms fire" refers to machine gun and rifle fire. "[E]ven though technically handguns are part of small arms fire, . . . it's not considered as part of it, the handguns. The military usually refers to small arms fire as machine guns and rifles."
On cross-examination, Kehr again acknowledged Saleem's vest was a "flak jacket" designed to stop shrapnel. Although it might have "some ballistic capabilities," that is not what it was designed for The following colloquy also occurred:
"Q [W]hen you looked at this booklet [i.e., the pamphlet found inside Saleem's vest] and told us that this vest does not protect you against small arms fire, you formed the opinion that there was still some small arms fire that it could protect you from like the .22 caliber?
"A Yes, ma'am.
"Q Okay. So despite the fact that that book[let] says this does not stop small arms fire, you believe that it does?
"A Yes.
"Q And this belief is just based upon your years of training and experience?
"A Yes, ma'am.
"Q And this belief is based upon the fact that you were able to cut open the jacket and look through the layers of material; is that correct?
"A Yes."

CONTENTIONS
1. Saleem contends there was insufficient evidence his protective vest constituted "body armor" under section 12370.
2. Saleem also contends section 12370 is unconstitutionally void for vagueness.

*263 DISCUSSION

1. There was sufficient evidence Saleem's vest constituted body armor.

a. The prohibition of section 12370.

Section 12370 outlaws the possession of body armor by a person previously convicted of a violent felony. In defining body armor, the statute specifically references the California Code of Regulations by providing, as relevant here: "Any person who has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5, . . . who purchases, owns, or possesses body armor, as defined by Section 942 of Title 11 of the California Code of Regulations . . . is guilty of a felony . . . ." (§ 12370, subd. (a).) The referenced portion of the California Code of Regulations sets out a detailed scheme establishing minimum technical standards for the certification of body armor to be purchased for law enforcement personnel.
Section 941 of the California Code of Regulations states: "This article shall apply to body armor (formerly referred to as bulletproof vests) to be purchased for State law enforcement officers and shall establish minimum requirements and testing methods to ensure ballistic resistance for certification purposes. Police body armor submitted by manufacturers for certification by the Department of Justice shall meet the minimum standards specified in these regulations." (Cal. Code Regs., tit. 11, § 941.) Section 942 of the regulations states: "Wherever these terms are used in this article, the following definitions shall apply: [¶] . . . [¶] (e) Body Armor. `Body armor' is popularly called a `bulletproof vest'. For purposes of these regulations, `body armor' means those parts of a complete armor that provide ballistic resistance to the penetration of the test ammunition for which a complete armor is certified. . . ." (Cal. Code Regs., tit. 11, § 942, subd. (e), italics added.)
Subsequent sections of the California Code of Regulations set out the "minimum requirements and testing methods" to be employed in ascertaining "ballistic resistance for certification purposes." (Cal. Code Regs., tit. 11, § 941.) If body armor meets the requirements for configuration, workmanship and labeling, it is then tested for ballistic protection: "Body armor shall protect against the standard test rounds specified in Section 946 of this title. It shall also provide protection against the lesser threats listed in Table 1 for Type I, such as 12 gauge 00 buckshot, 22 caliber Long Rifle, High Velocity, 38 Special, and most other factory loads in 357 Magnum and 9 mm rounds." (Cal. Code Regs., tit. 11, § 945, subd. (e).) The regulations specify particular equipment and supplies to be used in the testing. (Cal. Code Regs., tit. 11, § 946.) For instance, use of a chronograph is specified, which the regulations *264 explain is "an instrument that times projectiles in flight" and "consists of triggering screens and electronic time measurement controls." (Cal. Code Regs., tit. 11, § 942, subd. (g).) The specific test ammunition to be used is set out in the margin.[3]

b. No requirement the proscribed vest be previously certified.

Saleem contends his conviction must be set aside because a violation of section 12370 required evidence his protective body vest had been certified as body armor, under the testing regimen specified by the California Code of Regulations, and the People presented no such evidence.
(1) We reject this claim because the plain meaning of the foregoing provisions is that the proscribed vest need not have been previously certified in order for its possession to violate section 12370. Rather, the statute prohibits possession of a body vest that meets the certification requirements set forth in the regulations. Applied here, this only required proof the vest Saleem wore was equivalent to, or better than, body armor that is certified for sale to law enforcement. Thus, although certification is required before body armor may be purchased for law enforcement, certification is not an element of a section 12370 violation.

*265 c. Reliance on Chapple for prior certification misplaced.

Saleem relies on People v. Chapple (2006) 138 Cal.App.4th 540 [41 Cal.Rptr.3d 680]. But Chapple did not hold section 12370 only applies to a vest that has been previously certified. In Chapple, the only testimony regarding the ballistic capability of the vest was provided by the arresting officer. Rejecting the People's argument "that bulletproof vests, like firearms, are sufficiently within common experience to be identified at trial by lay witnesses," Chapple held the question whether the vest constituted prohibited body armor could only be decided by expert testimony. (People v. Chapple, supra, at p. 548.) In the course of its discussion, Chapple said, "The body armor proscribed by section 12370(a) must be certified based on its `ballistic resistance to the penetration of . . . test ammunition.'" (Id. at pp. 548-549.) However, this statement was not part of Chapple's holding that lay opinion is insufficient to support a conviction for possessing body armor. Moreover, in the very next sentence, Chapple indicated the prosecutor need only show that "the vest seized in this case met such certification standards. . . ." (Id. at p. 549.) To whatever extent Chapple may be read as requiring the prosecutor to prove the vest already has been certified for purchase by law enforcement, we disagree.

d. Legislative history does not support this argument.

The legislative history of section 12370 indicates the Legislature was concerned about "the tide of recent criminal incidents which create [sic] a dangerously threatening environment for both police officers and citizens," because violent perpetrators were wearing body armor. (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, p. 1.) Nothing indicates the statute was meant to address only body armor that had already been certified. Indeed, limiting application of the statute to already certified body armor would frustrate the purpose of the legislation by decriminalizing possession of uncertified body armor, regardless of its ballistic capabilities. Such a construction would permit a criminal to avoid the proscription of the statute merely by using uncertified body armor. All the statute requires is that the defendant's protective body vest meets the certification standards.
Hence, we reject Saleem's claim his conviction must be reversed because there was no evidence the vest he possessed already had been certified under the testing regimen set forth in the California Code of Regulations.

2. Section 12370 is void for vagueness.

Saleem contends section 12370 is void for vagueness because it failed to provide fair notice that his body vest was illegal. We agree.

*266 a. The void for vagueness doctrine.

(2) "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. [Citations.] Although the doctrine focuses both on actual notice to citizens and arbitrary enforcement, we have recognized recently that the more important aspect of vagueness doctrine `is not actual notice, but the other principal element of the doctrinethe requirement that a legislature establish minimal guidelines to govern law enforcement.' [Citation.] Where the legislature fails to provide such minimal guidelines, a criminal statute may permit `a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' [Citation.]" (Kolender v. Lawson (1983) 461 U.S. 352, 357-358, fn. omitted [75 L.Ed.2d 903, 103 S.Ct. 1855].)
(3) "[T]he underlying concern [of the void for vagueness doctrine] is the core due process requirement of adequate notice." (People ex rel. Gallo v. Acuna (1997) 14 Cal.4th 1090, 1115 [60 Cal.Rptr.2d 277, 929 P.2d 596].) "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties, is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law. And a statute which either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. [Citations.]" (Connally v. General Const. Co. (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 46 S.Ct. 126].) "A law failing to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited violates due process under both the federal and California Constitutions." (Kasler v. Lockyer (2000) 23 Cal.4th 472, 498-499 [97 Cal.Rptr.2d 334, 2 P.3d 581], italics added.)

b. Section 12370's knowledge requirement.

We already have concluded, ante, that neither prior certification of the body vest, nor prior testing, pursuant to the technical specifications contained in title 11 of the California Code of Regulations, is an element of the criminal offense set forth in section 12370. However, as we explain, a necessary element of the offense is either actual knowledge of, or negligence with regard to, the facts making possession of a particular body vest illegal under the statute.
(4) Section 12370 does not contain an explicit knowledge element. This does not mean the Legislature did not intend to require one, however. "As a *267 general rule, no crime is committed unless there is a union of act and either wrongful intent or criminal negligence. [Citations.] This rule, which is `firmly embedded' in `"the principles of Anglo-American criminal jurisprudence"' [citation] is so basic that wrongful intent or criminal negligence `is an invariable element of every crime unless excluded expressly or by necessary implication' [citations] and `penal statutes will often be construed to contain such an element despite their failure expressly to state it' [citations]." (People v. King (2006) 38 Cal.4th 617, 622-623 [42 Cal.Rptr.3d 743, 133 P.3d 636].) Courts have been "justifiably reluctant" to construe offenses carrying substantial penalties as strict liability offenses where dispensing with mens rea would "`require the defendant to have knowledge only of traditionally lawful conduct.'" (In re Jorge M. (2000) 23 Cal.4th 866, 881 [98 Cal.Rptr.2d 466, 4 P.3d 297].) "The prevailing trend in the law is against imposing criminal liability without proof of some mental state where the statute does not evidence the Legislature's intent to impose strict liability." (In re Jennings (2004) 34 Cal.4th 254, 267 [17 Cal.Rptr.3d 645, 95 P.3d 906].) Indeed, "at least where the penalties imposed are substantial, section 20[4] can fairly be said to establish a presumption against criminal liability without mental fault or negligence, rebuttable only by compelling evidence of legislative intent to dispense with mens rea entirely." (In re Jorge M., supra, at p. 879.)

c. Public welfare exception does not apply.

(5) An exception exists for public welfare offenses, crimes involving "the violation of statutes that are purely regulatory in nature and seek to protect the health and safety of the public." (People v. King, supra, 38 Cal.4th at p. 623.) "`"Under many statutes enacted for the protection of the public health and safety, e.g., traffic and food and drug regulations, criminal sanctions are relied upon even if there is no wrongful intent."'" (In re Jorge M., supra, 23 Cal.4th at p. 872.) Public welfare offenses usually involve light penalties and "`"no moral obloquy or damage to reputation"'" (People v. King, supra, at p. 623), and the statutory purpose is regulation rather than punishment. "`"The offenses are not crimes in the orthodox sense, and wrongful intent is not required in the interest of enforcement."'" (Ibid.)
In re Jorge M., supra, 23 Cal.4th 866, is instructive. There, a juvenile was found in possession of an unregistered assault weapon in violation of section 12280, a provision contained in the Roberti-Roos Assault Weapons Control Act of 1989 (§ 12275 et seq.; AWCA). He contended there was insufficient evidence he knew the gun had the characteristics of an assault weapon for which registration was required. After considering a variety of relevant *268 factors, Jorge M. concluded that, although the AWCA was a "remedial law aimed at protecting the public against a highly serious danger to life and safety" (In re Jorge M., supra, at p. 880), the crime was not a public welfare offense. The court concluded the Legislature intended "a degree of scienter regarding the character of the firearm"; otherwise, there was too great a risk of severely punishing innocent possession. (Id. at p. 885.) However, effective enforcement of the law demanded the prosecution need only show the defendant knew, or reasonably should have known, the firearm had characteristics bringing it within the AWCA. "To require moreespecially to require knowledge of the law as the amici curiae proposewould seriously impede effective enforcement of the AWCA, contrary to the legislative intent." (23 Cal.4th at p. 886.)
Hence, actual knowledge regarding the firearm's prohibited characteristics was not an element; it was sufficient that the defendant should have known about the prohibited characteristics. The Legislature "presumably did not intend the possessor of an assault weapon to be exempt from the AWCA's strictures merely because the possessor did not trouble to acquaint himself or herself with the gun's salient characteristics." (In re Jorge M., supra, 23 Cal.4th at p. 888.)
In the case at bar, the People appropriately do not argue section 12370 is a public welfare offense. Section 12370 is not akin to a regulatory traffic or food and drug statute. Violation of section 12370 is a felony punishable by a prison term of between 16 months and three years. Thus, the penalty for the crime is not light and a conviction is not free from moral obloquy. (See In re Jorge M., supra, 23 Cal.4th at p. 873 [damage to reputation necessarily attaches to felony conviction]; see also Staples v. United States (1994) 511 U.S. 600, 616 [128 L.Ed.2d 608, 114 S.Ct. 1793] [historically, "the small penalties attached to [public welfare] offenses logically complemented the absence of a mens rea requirement . . ."].) Although there is no bright-line rule regarding punishment for public welfare offenses, the Legislature's choice to categorize violation of section 12370 as a felony, and prescribe significant prison terms upon conviction, "reinforces the presumption expressed by section 20 and suggests that correspondingly strong evidence of legislative intent is required to exclude mens rea from the offense." (In re Jorge M., supra, at p. 880.)
The available legislative history of section 12370 contains no discussion of a knowledge element, nor does it contain any compelling evidence that the Legislature intended to dispense with one. Further, nothing meaningfully differentiates section 12370's prohibition on body armor by a violent felon from other similar prohibitions on dangerous items, for which a knowledge element typically has been required. (See, e.g., People v. King, supra, 38 *269 Cal.4th at pp. 627-628 [short-barreled rifle]; In re Jorge M., supra, 23 Cal.4th at p. 887 [unregistered assault weapon]; People v. Rubalcava (2000) 23 Cal.4th 322, 331-332 [96 Cal.Rptr.2d 735, 1 P.3d 52] [dirk or dagger]; People v. Westlund (2001) 87 Cal.App.4th 652, 658 [104 Cal.Rptr.2d 712] [firearm silencer].)

d. Elements of section 12370's knowledge requirement.

(6) Having concluded section 12370 must be construed to contain a knowledge element, we next address the question of precisely what that element entails. Crimes involving possession of contraband typically require proof of two types of knowledge: (1) knowledge that one actually possesses the item in question, and (2) knowledge of those characteristics making the item illegal.
First, the defendant must know he or she is actually in possession of the allegedly prohibited item. (See, e.g., People v. Rubalcava, supra, 23 Cal.4th at p. 332, fn. 6 [where statute prohibited possession of a dirk or dagger: "[A] person could slip a knife into a defendant's pocket without his [or her] knowledge or give a defendant a fixed-blade knife wrapped in a paper towel, but tell the defendant the knife has a folding blade that cannot lock. In these cases, the defendant would lack the necessary mens rea."].) Here, the prosecution had to prove Saleem knew he was in possession of the body vest.
Second, the defendant must know, or reasonably should have known, the characteristics of the item possessed that make it illegal. (See, e.g., In re Jorge M., supra, 23 Cal.4th at p. 887 [where issue is illegal possession of assault weapon, People must prove defendant knew or reasonably should have known "the firearm possessed the characteristics bringing it within the AWCA"]; People v. King, supra, 38 Cal.4th at p. 627 [in prosecution for possession of short-barreled rifle, People must prove defendant "knew the rifle was unusually short, but the defendant need not know the rifle's actual dimensions"]; People v. Rubalcava, supra, 23 Cal.4th at p. 332 [in prosecution for carrying concealed dirk or dagger, defendant must know weapon can be used for stabbing].)
Hence, the prosecution had to prove Saleem knew, or reasonably should have known, the body vest in his possession had characteristics making it illegal under section 12370.

e. Section 12370 is void for vagueness.

(7) Saleem argues section 12370 is unconstitutionally void for vagueness because its definition of body armor did not give him fair notice of the *270 characteristics making his body vest illegal. "[I]n determining whether the relevant language [of the challenged statute] is sufficiently certain to meet the constitutional requirement of fair notice, `we look first to the language of the statute, then to its legislative history, and finally to the California decisions construing the statutory language.'" (People v. Heitzman (1994) 9 Cal.4th 189, 200 [37 Cal.Rptr.2d 236, 886 P.2d 1229].) As judged by each one of these three factors, section 12370 is manifestly void for vagueness.

(1) Language of the statute.

Section 12370, subdivision (a), provides that violent felons who possess "body armor, as defined by Section 942 of Title 11 of the California Code of Regulations" are guilty of a felony. (Italics added.) Section 942 of the regulations, which contains a list of definitions, states: "Wherever these terms are used in this article, the following definitions shall apply . . . ." (Cal. Code Regs., tit. 11, § 942.) Subdivision (e) of section 942 of the regulations defines body armor. It states: "`Body armor' is popularly called a `bulletproof vest'. For purposes of these regulations, `body armor' means those parts of a complete armor that provide ballistic resistance to the penetration of the test ammunition for which a complete armor is certified. . . ." (Cal. Code Regs., tit. 11, § 942, subd. (e), italics added.)
(8) We believe the plain meaning of these two intersecting provisions is dictated by the two italicized phrases. Section 12370 relies on the regulations to define the prohibited item, and the second sentence of California Code of Regulations, title 11, section 942, subdivision (e), supplies that definition. We read the first sentence of subdivision (e) as merely giving a general introductory characterization to the term "body armor," and the second sentence as providing the actual definition. We do not believe the first sentence of subdivision (e) purports to define body armor as any garment popularly known as a bulletproof vest. If it did, it would render the entire second sentence meaningless. Hence, the body armor proscribed by section 12370 is not just any garment popularly known as a bulletproof vest. Given the detailed technical specifications spelled out in the California Code of Regulations, and specifically referenced by section 12370, the proscribed body armor must be some subset of the category garments "popularly called bulletproof vests."
The Attorney General tries to resist this reading of California Code of Regulations, title 11, section 942, subdivision (e), by asserting that "`body armor' is defined . . . using a phrase of common knowledge: a bulletproof vest." However, during the course of his appellate brief, the Attorney General sometimes reads this language much more narrowly. Thus, he says section 12370 "criminalizes possession of what is commonly known as a bulletproof *271 vest, or more specifically, an item that provides ballistic resistance to the types of bullets used to certify body armor for purchase by law enforcement." (Italics added.) And again: "[A]ccording to the plain language of the statute, `body armor' is any piece of a complete armor that provides ballistic resistance to the type of ammunition used in the testing done to certify body armor for purchase by law enforcement pursuant to Article I."
Sometimes the Attorney General tries to read this language both broadly and narrowly at the same time: "Section 12370, subdivision (a), read in context with section 942 of the Regulations, provides a clear definition of `body armor' as being an item first and foremost that is popularly known as a `bulletproof vest.' As such a term is clearly within the common knowledge, there is nothing vague about the law. Further, the law clarifies that `body armor' is an item that provides ballistic resistance to the types of ammunition used to test body armor in the certification process."
(9) This attempt to promote the importance of the first sentence in California Code of Regulations, title 11, section 942, subdivision (e), at the expense of the second sentence, contradicts two maxims of statutory construction. "First, in reviewing the text of a statute, we must follow the fundamental rule of statutory construction that requires every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary." (People v. Arias (2008) 45 Cal.4th 169, 180 [85 Cal.Rptr.3d 1, 195 P.3d 103].) (10) "A second principle of statutory construction explains that, when a particular class of things modifies general words, those general words are construed as applying only to things of the same nature or class as those enumerated. [Citation.] This canon of statutory construction, which in the law is known as ejusdem generis, `"applies whether the specific words follow general words in a statute or vice versa. In either event, the general term or category is `restricted to those things that are similar to those which are enumerated specifically.'" [Citation.]'" (Ibid.) "The rule is `based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.' [Citations.] [¶] `In construing criminal statutes the ejusdem generis rule of construction is applied with stringency. [Citations.]' [Citation.]" (Id. at pp. 180-181.)
Had the Legislature intended to prohibit violent felons from possessing any bulletproof vest whatsoever, it would have constructed a definition restricted to just the first sentence of California Code of Regulations, title 11, section 942, subdivision (e). But it did not do this. Instead, it followed the first sentence with the second sentence, thus incorporating a specific ballistics testing regimen into the definition of body armor. The Attorney General's *272 broad reading of section 942, subdivision (e), clashes with the very structure of the subdivision and renders meaningless the language requiring body armor to meet the certification standards.

(2) Legislative history.

Reading the legislative history of section 12370 leads to the same conclusion. When section 12370 was enacted in 1998, there was already a California law defining bulletproof vests. Originally enacted in 1982, section 12022.2, subdivision (b), currently provides, in pertinent part: "Any person who wears a body vest in the commission or attempted commission of a violent offense . . . shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one, two, or five years." Subdivision (c) of section 12022.2 provides: "As used in this section, `body vest' means any bullet-resistant material intended to provide ballistic and trauma protection for the wearer." (Italics added.)
When section 12370 was drafted, the Legislature was aware of section 12022.2 and its definition of "body vest." The bill analyses from the Assembly and Senate Committees on Public Safety acknowledged the existence of section 12022.2, and specifically noted its definition of "body vest" in subdivision (c). Both bill analyses then indicated the new statute would contain a different definition of the proscribed garment: "Body Armor Definition. This bill defines body armor by referencing the definition contained within the California Code of Regulations, Section 942, Title 11." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, p. 2, underscoring omitted, italics added; see Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, p. 3, italics added.)
The Attorney General gets this legislative history wrong, arguing: "[A]fter stating the definition contained in [California Code of Regulations, title 11,] section 942, the [committee] reports indicate that a `body vest' is defined `as any bullet-resistant material intended to provide ballistic and trauma protections for the wearer.' [Citations.] In other words, the committee defined `body armor' as a bulletproof vest, then defined `body vest' as any bullet-resistant material intended to provide ballistic protection for the wearer." In fact, however, the references in the committee reports to this much broader definition were references to section 12022.2's definition, not to the definition the Legislature chose to adopt for section 12370.
Hence, even if Saleem knew his garment qualified as a "body vest" under section 12022.2, because it was made out of some kind of bullet-resistant *273 material, the question remains whether Saleem, as a person of ordinary intelligence, would have any reasonable way of knowing his vest met the far more stringent requirements necessary to qualify as "body armor" under section 12370. The Legislature's decision in section 12370 to ignore section 12022.2, and instead reference the California Code of Regulations's definition of body armor, indicates a deliberate choice to use a different standard in the newer statute.[5]

(3) California decisions.

The third Heitzman factor looks at how California decisions have construed the statutory language. The only case interpreting section 12370 has been People v. Chapple, supra, 138 Cal.App.4th 540. In that case, the People appealed the dismissal of an information charging a violation of section 12370. The defendant had argued there was insufficient evidence to support the information because the only evidence his garment was proscribed by section 12370 came in the form of a police officer's lay opinion that the vest was "`a body armor vest, bullet proof vest.'" (People v. Chapple, supra, at p. 544.) Asked at the preliminary hearing how he knew what a bulletproof vest looked like, the officer testified he wore one and that his brother, who was also a police officer, had worn one. On appeal, the People did not challenge a ruling the officer could not testify as an expert, but instead "argue[d] that bulletproof vests, like firearms, are sufficiently within common experience to be identified at trial by lay witnesses." (Id. at p. 548.) Chapple rejected this argument, holding: "The crime charged consists of elements incapable of determination by the trier of fact without the assistance of an expert. The body armor proscribed by section 12370(a) must be certified based on its `ballistic resistance to the penetration of . . . test ammunition.' (Cal. Code Regs., tit. 11, § 942, subd. (e).) Clearly, whether or not the vest seized in this case met such certification standards involved concepts beyond common experience, and, thus, was a proper subject for expert testimony, but not for a lay opinion." (Id. at pp. 548-549, italics added, fn. omitted.)
We agree with Chapple's conclusion that only an expert would know if any particular protective body vest was proscribed by section 12370.[6] And, if that *274 is so, then we do not see how, without providing something like an official list of prohibited vests, the statute can be said to provide either fair notice to a defendant or meaningful guidelines to the officer on the street.

(4) Inadequate notice.

The constitutional issue here concerns the problem of providing adequate notice of exactly which protective body vests are prohibited by section 12370. As explained by cases construing bans on assault weapons, the void for vagueness doctrine requires such notice to be made in terms that are meaningful to people of ordinary intelligence.
Robertson v. City and County of Denver (Colo. 1994) 874 P.2d 325, addressed an ordinance defining assault weapons as including "`[a]ll semiautomatic pistols that are modifications of rifles having the same make, caliber and action design but a shorter barrel and no rear stock or modifications of automatic weapons originally designed to accept magazines with a capacity of twenty-one (21) or more rounds.'" (Id. at p. 334.) The trial court had concluded this language was vague because "`[p]ersons attempting to comply with this section must . . . learn not only what guns their pistol was designed from, but also learn the design history of the ancestor guns to determine if it was [an] automatic weapon `originally designed to accept magazines with a capacity of twenty-one (21) or more rounds' or if it has `the same' action design. These characteristics can not be readily [ascertained] by a person of common intelligence.'" (Ibid.)
The Colorado Supreme Court agreed with this reading: "[T]he assault weapon ordinance does not specify any source which would aid in defining what an assault pistol is, nor does it state where such a source can be found. [¶] [The ordinance] does not provide sufficient information to enable a person of common intelligence to determine whether a pistol they possess or may purchase has a design history of the sort which would bring it within this section's coverage. As the trial court correctly concluded, ascertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence. Consequently, we conclude that the trial court correctly determined that [the ordinance] is unconstitutionally vague." (Robertson v. City and County of Denver, supra, 874 P.2d at p. 335.)
Springfield Armory, Inc. v. City of Columbus (6th Cir. 1994) 29 F.3d 250, involved a challenge to a municipal ban on assault weapons. "The ordinance *275 defines `assault weapon' as any one of thirty-four specific rifles, three specific shotguns and nine specific pistols, or `[o]ther models by the same manufacturer with the same action design that have slight modifications or enhancements. . . .'" (Id. at p. 251) After asking, "How is the ordinary consumer to determine which changes may be considered slight? A weapon's accuracy, magazine capacity, velocity, size and shape and the caliber of ammunition it takes can all be altered," Springfield Armory held the ordinance was void for vagueness: "Nothing in the ordinance provides sufficient information to enable a person of average intelligence to determine whether a weapon they wish to purchase has a design history of the sort which would bring it within this ordinance's coverage." (Id. at p. 253.)
Harrott v. County of Kings (2001) 25 Cal.4th 1138 [108 Cal.Rptr.2d 445, 25 P.3d 649], like In re Jorge M., supra, 23 Cal.4th 866, construed the AWCA. The trial court held the plaintiff's semiautomatic rifle constituted an assault weapon under section 12276 on the ground it was an "AK series" weapon. Section 12276, subdivision (a), contains a list of prohibited rifles, identified by manufacturer and model number. Subdivision (e) of section 12276 provides: "The term `series' includes all other models that are only variations, with minor differences, of those models listed in subdivision (a), regardless of the manufacturer." The trial court held the plaintiff's rifle was illegal even though expert witnesses for both sides agreed the rifle was not an AK series weapon because its manufacturer markings did not match any markings in the Attorney General's assault weapons identification guide, which was distributed to local law enforcement and published in the California Code of Regulations. The trial court relied on the fact the Kings County's expert had "conceded that any variations between this rifle and an AK reference weapon (the AK 47S) were only minor." (Harrott v. County of Kings, supra, at p. 1143.)
Harrott held, on due process grounds, the trial court had no authority to make this finding. "This case amply illustrates the difficulty an ordinary citizen might have, when a gun's markings are not listed in the Identification Guide, in determining whether a semiautomatic firearm should be considered an assault weapon under the AWCA." (Harrott v. County of Kings, supra, 25 Cal.4th at pp. 1146-1147, fn. omitted.) "Not only would ordinary citizens find it difficult, without the benefit of the Identification Guide, to determine whether a semiautomatic firearm should be considered an assault weapon, ordinary law enforcement officers in the field would have similar difficulty." (Id. at p. 1147, fn. 4.) "It can hardly be argued that this statute does not raise serious and doubtful constitutional questions as applied to ordinary citizens. The language found constitutionally problematic by the Sixth Circuit Court of Appeals in Springfield Armory . . ., and by the Colorado Supreme Court in Robertson v. City and County of Denver . . ., was more specific than the language at issue here." (Id. at p. 1153.) Our Supreme Court concluded *276 "ordinary citizens are not held responsible for answering the question raised by Mr. Harrottwhich differences are only `minor' within the meaning of section 12276, subdivision (e)?" (Ibid.)

3. For all the reasons set forth herein, we conclude section 12370 is void for vagueness.

As we have explained, ante, the core due process concern underlying the void for vagueness doctrine is fair notice. In the context of section 12370, that means the statute must provide a person of ordinary intelligence with a reasonable opportunity to determine if his or her body vest falls within the subset of body vests prohibited by section 12370.
We have no doubt Saleem knew he was in possession of a body vest. The evidence shows the vest weighed about 10 pounds and Saleem obviously knew he was wearing it. Was he given a reasonable opportunity to determine if his vest was illegal under section 12370?
Officer Rivera, who was not an expert, opined on the basis of his military experience in Iraq that Saleem's vest would protect against various handgun ammunition. But Rivera's opinion was based on having participated in a field test that Officer Kehr, who was an expert, characterized as entirely inadequate for certification purposes. As Chapple held: "The crime charged consists of elements incapable of determination by the trier of fact without the assistance of an expert. The body armor proscribed by section 12370(a) must be certified based on its `ballistic resistance to the penetration of . . . test ammunition.' (Cal. Code Regs., tit. 11, § 942, subd. (e).) Clearly, whether or not the vest seized in this case met such certification standards involved concepts beyond common experience, and, thus, was a proper subject for expert testimony, but not for a lay opinion." (People v. Chapple, supra, 138 Cal.App.4th at pp. 548-549, italics added, fn. omitted.) If it takes an expert to make this determination, how can the statute have provided fair notice to Saleem?
The expert here, Officer Kehr, knew how to measure ballistic resistance properly, and he was aware of how such factors as a bullet's weight, shape, composition, jacketing and velocity would affect its ability to penetrate a particular body vest. He testified Saleem's vest was a flak jacket designed to protect against shrapnel from exploding mines and hand grenades, not bullets. But Kehr also testified he believed Saleem's vest would protect against certain handgun ammunition. We do not see why an ordinary person should have known a body vest designed to stop shrapnel nevertheless had ballistic capabilities bringing it within the subset of vests outlawed by section 12370.
*277 The use-and-care pamphlet inside Saleem's vest carried the following warning: "This vest does not protect you against small arms fire." We think an ordinary person would understand "small arms" to include handguns.[7] Nevertheless, Kehr testified this warning did not change his opinion about the ballistic capabilities of Saleem's vest because, "even though technically handguns are part of small arms fire," the military "usually refers to small arms fire as machine guns and rifles." We do not think a person of ordinary intelligence should have been aware of this special military meaning of "small arms." Granted, the label on Saleem's vest also said it was body armor. But, as we have explained, section 12370 establishes a very technical definition of body armor; it does not mean any garment popularly known as a bulletproof vest.
(11) The Legislature specifically crafted section 12370 to incorporate the technical definition of body armor contained in the California Code of Regulations. The regulations's technical definition entails a rigorous testing regimen requiring the use of sophisticated testing facilities to establish that a particular body vest will protect against specified test ammunition.[8] Even if Saleem had read section 12370 and the regulations, he could not have reasonably ascertained his vest possessed the characteristics making it illegal under section 12370. This failure to provide fair notice is exactly what offends due process. Hence, we conclude section 12370 violates the void for vagueness doctrine and that Saleem's conviction must be reversed.[9]

*278 DISPOSITION
The judgment is reversed.
Croskey, J., concurred.
ALDRICH, J., Dissenting.
In November 1994, San Francisco Police Officer James Guelff was shot and killed by a heavily armed carjacking suspect who was wearing body armor. Less than three years later, in February 1997, two heavily armed bank robbers protected by body armor held off police after robbing a North Hollywood bank. During the ensuing gun battle, 11 police officers and six civilians were wounded. In response to these and other troubling incidents, in 1998 the Legislature enacted Penal Code section 12370, which, subject to exceptions not relevant here, prohibits persons who have been convicted certain violent felonies from purchasing, owning, or possessing "body armor."
Penal Code section 12370 defines "body armor" by reference to title 11, section 942, subdivision (e), of the California Code of Regulations, which states in pertinent part: "`Body armor' is popularly called a `bulletproof vest'. For purposes of these regulations, `body armor' means those parts of a complete armor that provide ballistic resistance to the penetration of the test ammunition for which a complete armor is certified." In my view, the first sentence of the statutory definition defines body armor sufficiently to give ordinary persons ample notice of what is prohibited. The second sentence provides a precise definition sufficient to prevent arbitrary enforcement of the law. The statute, therefore, is not unconstitutionally vague.
Defendant Ethan Saleem has a prior conviction for voluntary manslaughter, one of the violent felonies specified by Penal Code section 12370. In January 2007, Los Angeles Police Department officers discovered Saleem wearing a 10-pound, camouflage-patterned vest labeled "body armor." The People presented expert testimony sufficient to prove the vest provided ballistic resistance to relevant types of test ammunition. The evidence was therefore sufficient to prove Saleem knowingly possessed body armor within the meaning of the statute.
Because I discern no constitutional infirmity in Penal Code section 12370, and because I believe there was sufficient evidence to prove both that the vest constituted body armor and that Saleem knew its character, I would affirm Saleem's conviction. Accordingly, I respectfully dissent.

*279 Penal Code section 12370 is not void for vagueness.

a. Applicable principles governing statutory construction.

The majority correctly recites the facts of the case, and I do not repeat them here. Instead, I turn directly to analysis of the statutory language.
When interpreting a statute, our "`fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.'" (People v. Lewis (2008) 43 Cal.4th 415, 491 [75 Cal.Rptr.3d 588, 181 P.3d 947]; see People v. King (2006) 38 Cal.4th 617, 622 [42 Cal.Rptr.3d 743, 133 P.3d 636]; People v. Ramirez (2009) 45 Cal.4th 980, 987 [89 Cal.Rptr.3d 586, 201 P.3d 466].) "`We begin by examining the statute's words, giving them a plain and commonsense meaning. [Citation.]'" (People v. Lewis, supra, at p. 491.) If the statutory language is unambiguous, the plain meaning controls. (People v. King, supra, at p. 622.) If the statutory language is reasonably susceptible to more than one interpretation, we may consider various extrinsic aids, including "`"`the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute.'"' [Citations.]" (Ibid.; see People v. Ramirez, supra, at p. 987; In re Derrick B. (2006) 39 Cal.4th 535, 539 [47 Cal.Rptr.3d 13, 139 P.3d 485].) We must adhere to the "fundamental rule of statutory construction that requires every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary. `Significance should be given, if possible, to every word of an act. [Citation.] Conversely, a construction that renders a word surplusage should be avoided. [Citations.]' [Citations.]" (People v. Arias (2008) 45 Cal.4th 169, 180 [85 Cal.Rptr.3d 1, 195 P.3d 103].)
A criminal statute is void for vagueness only if it fails to provide adequate notice to ordinary people of the kind of conduct prohibited, or if it authorizes arbitrary and discriminatory enforcement by "`"delegat[ing] basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis."'" (People v. Rubalcava (2000) 23 Cal.4th 322, 332 [96 Cal.Rptr.2d 735, 1 P.3d 52]; see Kolender v. Lawson (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 103 S.Ct. 1855]; People v. Misa (2006) 140 Cal.App.4th 837, 844 [44 Cal.Rptr.3d 805].) "To satisfy constitutional mandates, a statute must: (1) be sufficiently definite to provide adequate notice of the conduct that is proscribed; and (2) provide sufficiently definite guidelines for the police so as to prevent arbitrary or discriminatory enforcement." (People v. Misa, supra, at p. 844; see Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1106-1107 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; People v. Heitzman (1994) 9 Cal.4th 189, 199-200 [37 Cal.Rptr.2d 236, 886 P.2d 1229]; Burg v. Municipal Court (1983) 35 Cal.3d 257, 269 [198 Cal.Rptr. 145, 673 P.2d 732]; People v. Tapia (2005) *280 129 Cal.App.4th 1153, 1166 [29 Cal.Rptr.3d 158].) "`"Void for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." [Citation.]' [Citations.]" (People v. Tapia, supra, at p. 1166.) Only a reasonable degree of certainty is required. (Tobe v. City of Santa Ana, supra, at p. 1107; People v. Misa, supra, at p. 844.)
There is a "`strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. [Citations.] A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language,"'" or if its terms may be made reasonably certain by reference to other definable sources. (People v. Morgan (2007) 42 Cal.4th 593, 605-606 [67 Cal.Rptr.3d 753, 170 P.3d 129]; see People v. Maciel (2003) 113 Cal.App.4th 679, 684 [6 Cal.Rptr.3d 628]; People v. Tapia, supra, 129 Cal.App.4th at p. 1167; People v. Sullivan (2007) 151 Cal.App.4th 524, 543 [59 Cal.Rptr.3d 876].) It has long been the law that "`[i]f a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers.' [Citations.]" (People v. Superior Court (Romero) (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628]; see Miller v. Municipal Court (1943) 22 Cal.2d 818, 828 [142 P.2d 297]; Taxpayers for Improving Public Safety v. Schwarzenegger (2009) 172 Cal.App.4th 749, 769-770 [91 Cal.Rptr.3d 370].)
Penal Code section 12370, subdivision (a) provides: "Any person who has been convicted of a violent felony, as defined in subdivision (c) of Section 667.5, under the laws of the United States, the State of California, or any other state, government, or country, who purchases, owns, or possesses body armor, as defined by Section 942 of title 11 of the California Code of Regulations, except as authorized under subdivision (b), is guilty of a felony, punishable by imprisonment in a state prison for 16 months, or two or three years."[1] As noted ante, California Code of Regulations, title 11, section 942, subdivision (e) provides in pertinent part: "`Body armor' is popularly called a `bulletproof vest'. For purposes of these regulations, `body armor' means *281 those parts of a complete armor that provide ballistic resistance to the penetration of the test ammunition for which a complete armor is certified."[2] The relevant portion of the statutory definition is therefore comprised of two component sentences, both of which must be given effect. (See People v. Arias, supra, 45 Cal.4th at p. 180.) As the majority correctly describes, the regulation is embedded in a portion of title 11 that sets forth minimum standards and detailed testing procedures for body armor suitable for purchase for California peace officers. (Cal. Code Regs., tit. 11, §§ 941-957.)

b. The precise definition of body armor contained in California Code of Regulations, title 11, section 942, subdivision (e) requires that the People prove the garment will withstand penetration by specified test ammunition, and prevents arbitrary enforcement of the law.

I turn first to analysis of the second sentence of the definition, i.e., "`body armor' means those parts of a complete armor that provide ballistic resistance to the penetration of the test ammunition for which a complete armor is certified." Parsing this language, it is apparent that for purposes of the statute, body armor is (1) a part of an armor (2) that provides ballistic resistance to the penetration of (3) test ammunition. The phrase, "for which a complete armor is certified" modifies "test ammunition." (See Anthony J. v. Superior Court (2005) 132 Cal.App.4th 419, 425-426 [33 Cal.Rptr.3d 677] ["`"A longstanding rule of statutory constructionthe `last antecedent rule' provides that `qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote'"'"].) "Ballistic" means "relating to . . . a body in motion according to the laws of ballistics," i.e., the science of the motion of projectiles in flight. (Merriam-Webster's Collegiate Dict. (10th ed. 1996) p. 88, col. 1.) "Resistance" means "an opposing or retarding force." (Merriam-Webster's Collegiate Dict., supra, p. 996, col. 2.) Thus, "ballistic resistance" simply means opposition to, and protection from, the specified test ammunition. (See Cal. Code Regs., tit. 11, § 945, subd. (e) [body armor shall protect "against the standard test rounds specified" by the regulations].) Penetration is defined in title 11, section 942, subdivision (j) as "complete perforation of an armor test sample by a test bullet or bullet fragment, or fragments of the armor evidenced by the presence of the bullet or fragment in the backing material, or by a hole that passes through a ballistic panel or vest." (See also Cal. Code Regs., tit. 11, § 945, subd. (f) [body armor "shall protect against penetration"].) Viewing the regulations as *282 a whole (People v. Cole (2006) 38 Cal.4th 964, 975 [44 Cal.Rptr.3d 261, 135 P.3d 669]), and by reference to the plain meaning of the words used, to obtain a conviction under Penal Code section 12370 the People must prove the garment provides ballistic resistance to penetration, i.e., complete perforation, from the types of ammunition specified in the regulations as the test ammunition for one or more armor types.
I therefore agree with the majority's conclusion that certification is not an element of a Penal Code section 12370 violation. As the majority correctly reasons, neither the legislative history, the plain language of the statute, nor People v. Chapple (2006) 138 Cal.App.4th 540 [41 Cal.Rptr.3d 680], establishes that certification is an element. (Maj. opn., ante, at p. 265.) Indeed, interpreting the phrase "body armor" to mean only an armor that has undergone the testing process set forth in title 11, division 1, chapter 11, and has been certified, makes little sense in the context of the chapter as a whole. California Code of Regulations, title 11, section 942 provides 12 definitions of terms as they are used in title 11, division 1, chapter 11, article 1. The portion of the regulations at issue addresses the procedures and specifications for testing body armor in order to obtain state Department of Justice certification. Therefore, it would make little sense for section 942 to define body armor as armor that has already been certified.
I part company with the majority, however, when it states that the statute proscribes only body armor that is "equivalent to, or better than, body armor that is certified for sale to law enforcement." (Maj. opn., ante, at p. 264.) Title 11 of the California Code of Regulations includes a variety of requirements for police-approved body armor, including specifications as to, inter alia, configuration, labeling, and workmanship, as well as detailed testing procedures. (Cal. Code Regs., tit. 11, § 945 et seq.) In my view, to establish a violation of Penal Code section 12370, the People need not prove a garment could pass the detailed testing regimen set forth in the regulations, nor must the garment meet the specifications regarding configuration, labeling, and workmanship. Instead, for the reasons I have explained, the plain language of the regulation requires only that the People prove the garment could prevent penetration from the types of ammunition specified in the regulations for one or more armor types.
This precise definition of body armor contained in the second definitional sentence of California Code of Regulations, title 11, section 942 provides sufficiently definite guidelines for police and prosecutors, so as to prevent arbitrary or discriminatory enforcement. (See Kolender v. Lawson, supra, 461 U.S. at pp. 357-358.) The statute gives little discretion regarding what constitutes proscribed body armor and prevents the expansion of the class of prohibited items beyond that contemplated by the Legislature. Only garments *283 that protect against penetration from the test ammunition fall within the statutory ambit. Thus, the second sentence of the definition protects against arbitrary enforcement by overzealous police or prosecutors who might take an overbroad view of which items could be categorized as body armor. "[T]he very precision of the standard assures the statute's validity in this respect." (Burg v. Municipal Court, supra, 35 Cal.3d at p. 270.)

c. California Code of Regulations, title 11, section 942 provides adequate notice of what conduct is prohibited.

My primary disagreement with the majority regards its treatment of the knowledge element, which is the basis for its conclusion that the statute is unconstitutionally void for vagueness. The majority holds that, due to the precise, technical definition of body armor contained in the second definitional sentence, only a subset of body armor is prohibited by the statute, i.e., only armor that is equivalent to or better than that certified for purchase by the State of California for peace officers. (Maj. opn., ante, at p. 264.) Thus, in the majority's view, the statute leaves violent felons perfectly free to purchase, wear, and possess other body armor that could not meet California's rigorous testing regime.
The majority further holds that, because only an expert can determine whether a garment meets the detailed technical specifications contained in California Code of Regulations, title 11, a violent felon, as a lay person, has no way to discern whether his or her body armor is equal to or better than California-certified armor, and is of the proscribed variety. Thus, the majority reasons, the statute fails to provide fair notice of "which protective body vests constitute the body armor made illegal by the statute" and of "the characteristics making [a] body vest illegal." (Maj. opn., ante, at pp. 258, 269-270.)
I respectfully disagree with this analysis. First, nothing in the history of Assembly Bill No. 1707 (1997-1998 Reg. Sess.), the legislation that enacted Penal Code section 12370, remotely suggests that the Legislature intended to create two categories of body armor, one permissible for violent felons to possess, the other not. Committee analyses clarify that according to the bill's author, the legislation "`was introduced to help stem the tide of recent criminal incidents which create a dangerously threatening environment for both police officers and citizens.'" (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, pp. 3-4; see Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended Mar. 19, 1998, p. 1.) Legislative analyses of the bill explain: "`Body armor or bulletproof vests originated in the early 1970's and [were] designed to be worn by peace officers to provide protection. Since 1973, there have been nearly 3,000 incidents where peace *284 officers['] lives were saved as a direct result of wearing body armor. Body armor was created with one purpose in mindto protect the individuals that risk their lives protecting us.'" (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1707, supra, at p. 3; see also Sen. Rules Com., Analysis of Assem. Bill No. 1707 (1997-1998 Reg. Sess.) as amended June 29, 1998, p. 2.) The bill's author recounted several troubling incidents in which criminals wore body armor, thwarting the ability of peace officers to apprehend them. "`Recent reports include a dangerous criminal, who in November of 1994, was able to fend off 120 armed police officers for 32 minutes. The gunman, protected by full body armor, killed a San Francisco police officer. Three years later, a bank robbery in North Hollywood led [to] a one-hour confrontation between two criminals shielded by full body armor and 350 police officers. The encounter resulted in two deaths and injuries to more than ten other persons. Graphic videotape of the incident showed the police officers' bullets literally bouncing off of the armored gunmen, delaying apprehension of the dangerous criminals. [¶] Another incident in Los Angeles involved two gang members stopped by police for a traffic violation who were found to be wearing bulletproof body armor. Both suspects had been convicted of past violent felonies and gun violations.'" (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1707, supra, at p. 4; see also Sen. Rules Com., Analysis of Assem. Bill No. 1707, supra, at p. 2; Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1707, supra, at p. 1.) According to the bill's author, "`[w]henever these frightening and often lethal confrontations occur, the lives of innocent citizens and police officers are unnecessarily placed in jeopardy. This legislation will assist law enforcement personnel to prevent and mitigate situations similar to the North Hollywood incident.'"[3] (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1707, supra, at p. 4; see also Sen. Rules Com., Analysis of Assem. Bill No. 1707, supra, at p. 2; Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1707, supra, at p. 1.) The act was denominated "the James Guelff Body Armor Act of 1998" (Stats. 1998, ch. 297, § 1), in honor of the slain San Francisco police officer.
The clear legislative intent behind Penal Code section 12370 was to stop the threat of violent felons who are able to thwart police officers by wearing body armor, potentially injuring or killing innocent officers or civilians in the process. The use of body armor by persons to resist police is still a genuine and pressing concern. (See Romero, A Brief History of Body Armor (Apr. 7, 2009) Time.com [as of Dec. 17, 2009] [referencing an Apr. 3, 2009 shooting at an immigration *285 center in New York in which 13 people were killed, and an Apr. 4, 2009 killing of three Pennsylvania police officers, both carried out by men wearing body armor, as the "latest examples of what investigators have begun calling `pseudo commandos'criminals who prepare for a showdown with law enforcement by strapping on bullet-resistant vests before battle"].) The bill's history indicates to me that the Legislature aimed to prohibit possession of any body armor by violent felons, whether homemade, equivalent to peace officer body armor, or of a lesser quality. I cannot conceive of a reason why the Legislature would have wished to decriminalize possession of certain types of body armor by violent felons. Section 12370 does not address a situation in which the Legislature could have been concerned about criminalizing only certain categories of an item, while leaving other categories available for legitimate uses. (See, e.g., In re Jorge M. (2000) 23 Cal.4th 866, 874-875, 878 [98 Cal.Rptr.2d 466, 4 P.3d 297] [discussing Roberti-Roos Assault Weapons Control Act of 1989 (Pen. Code, § 12275 et seq.)].) Instead, section 12370 prohibits, not a class of items, but a class of personsviolent felonsfrom possessing a particular item that is dangerous in their hands.
Further, subdivision (b) of Penal Code section 12370 provides that the police chief or sheriff in the applicable jurisdiction may grant an exception to the statute's prohibition when the ex-felon's employment, livelihood, or safety depends upon his or her ability to legally possess and use body armor. This provision, while not dispositive, suggests the Legislature did not intend to create a category of body armor which violent felons are lawfully permitted to possess. Had the law been intended to allow violent felons lawful access to a subcategory of body armor, arguably there would have been no need for the statutory exception.
Under these circumstances, and in line with our mandate to "give the statute a reasonable and commonsense interpretation consistent with the apparent purpose and intent of the lawmakers and resulting in wise policy rather than mischief or absurdity" (Anthony J. v. Superior Court, supra, 132 Cal.App.4th at p. 425), I do not believe the majority's concern that felons will be unable to distinguish between permissible and impermissible body armor is warranted. Certainly, if a violent felon is prosecuted for possession of body armor, and the People are unable to prove his or her vest could withstand penetration by the relevant test ammunition, the second definitional sentence of California Code of Regulations, title 11, section 942 will preclude a conviction. As I have explained, the precise definition of body armor in section 942, subdivision (e) serves to prevent arbitrary enforcement. A by-product of this requirement may well be that some violent felons who possess body armor will escape conviction. In my view, however, this reflects a legislative desire to avoid arbitrary enforcement, not an intent to decriminalize possession of a subcategory of body armor.
*286 Second, I see no reason to assume that the Legislature intended that a defendant's knowledge of the technical specifications of his or her body armor be an element of Penal Code section 12370. As the majority correctly notes, section 12370 does not expressly contain a knowledge element. (Maj. opn., ante, at p. 266.) The rule that no crime is committed absent the union of act and either wrongful intent or criminal negligence is fundamental, and penal statutes are often construed to contain such a knowledge element even where one is not expressly included. (People v. King, supra, 38 Cal.4th at pp. 622-623; Pen. Code, § 20; In re Jennings (2004) 34 Cal.4th 254, 267 [17 Cal.Rptr.3d 645, 95 P.3d 906]; In re Jorge M., supra, 23 Cal.4th at p. 872; People v. Coria (1999) 21 Cal.4th 868, 876 [89 Cal.Rptr.2d 650, 985 P.2d 970]; People v. Taylor (2001) 93 Cal.App.4th 933, 938-939 [114 Cal.Rptr.2d 23].) I also concur that section 12370 is not a public welfare offense. It is a felony, carries a significant penalty, is not comparable to a traffic or regulatory offense, and a conviction is not free from moral obloquy. (See In re Jorge M., supra, at pp. 879-880; People v. Coria, supra, at p. 877; People v. King, supra, 38 Cal.4th at p. 623.) Thus, as with other statutes barring possession of dangerous items, a knowledge element must be read into section 12370. (See, e.g., People v. King, supra, 38 Cal.4th at pp. 627-628 [short-barreled rifle]; In re Jorge M., supra, at p. 887 [unregistered assault weapon]; People v. Rubalcava, supra, 23 Cal.4th at pp. 331-332 [concealed dirk or dagger]; People v. Coria, supra, at p. 880 [manufacturing methamphetamine]; People v. Taylor, supra, at p. 941 [cane sword]; People v. Westlund (2001) 87 Cal.App.4th 652, 658 [104 Cal.Rptr.2d 712] [firearm silencer]; People v. Snyder (1982) 32 Cal.3d 590, 592 [186 Cal.Rptr. 485, 652 P.2d 42].)
Crimes involving possession of contraband typically require proof of two types of knowledge. First, the defendant must know that he or she possesses the prohibited item. (See, e.g., People v. Rubalcava, supra, 23 Cal.4th at p. 332; In re Jorge M., supra, 23 Cal.4th at p. 885; People v. Jeffers (1996) 41 Cal.App.4th 917, 922 [49 Cal.Rptr.2d 86].) For purposes of Penal Code section 12370, the defendant must know that he or she possesses, purchased, or owns the body armor. (Pen. Code, § 12370, subd. (a).) If, for example, a bulletproof vest was surreptitiously placed in the defendant's backpack by a third person, without the defendant's knowledge, the defendant would lack the necessary mens rea. (See People v. Rubalcava, supra, at p. 332 & fn. 6.)
The defendant must also know, or reasonably should have known, the character of the thing possessed. (See, e.g., In re Jorge M., supra, 23 Cal.4th at p. 887; People v. Westlund, supra, 87 Cal.App.4th at p. 657; People v. King, supra, 38 Cal.4th at p. 627 [in a prosecution for possession of a short-barreled rifle, the prosecution must establish that the defendant knew the rifle was short]; People v. Coria, supra, 21 Cal.4th at pp. 874-875, 880 [in a prosecution for possession or manufacture of a controlled substance, knowledge of the character of the substance is an essential element of the crime]; *287 People v. Rubalcava, supra, 23 Cal.4th at p. 332 [in a prosecution for carrying a concealed dirk or dagger, a defendant must know the weapon can be used as a stabbing weapon]; People v. Snyder, supra, 32 Cal.3d at p. 593 [in a prosecution for violation of Pen. Code, § 12021, felon in possession of a firearm, "the crucial question is whether the defendant was aware that he was engaging in the conduct proscribed by that section"]; People v. Montero (2007) 155 Cal.App.4th 1170, 1176 [66 Cal.Rptr.3d 668] [to be found guilty of possession of a controlled substance, defendant must know the character of the substance possessed].) Here, that means that an element of a prosecution under Penal Code section 12370 is that the defendant knew, or reasonably should have known, the character of the garment in question. (See In re Jorge M., supra, 23 Cal.4th at p. 887.) The "reasonably should have known" formulation is appropriate due to the public safety threat addressed by the statute, the number of prosecutions to be expected under it, and the difficulty of routinely proving actual knowledge by defendants. (Ibid.)
It does not necessarily follow, however, that the defendant must fully understand the technical specifications of his or her body armor. It is enough that a violent felon knows he or she possesses a bulletproof vest or body armor, as those terms are popularly understood, in line with the first definitional sentence of California Code of Regulations, title 11, section 942. I reach this conclusion for several reasons. First, the "`[f]air notice'" component of a void-for-vagueness inquiry "requires only that a violation be described with a `"reasonable degree of certainty"'" such that ordinary people can understand what conduct is prohibited. (Burg v. Municipal Court, supra, 35 Cal.3d at pp. 270-271.) The notice provided must be such that prosecution "does not `trap the innocent' without `fair warning.' [Citation.]" (Id. at p. 271.) Here, that standard is certainly met. Penal Code section 12370 clearly defines the class of persons covered by the statute: individuals who have been convicted of specified violent felonies. The first sentence in section 942 clearly, simply, and in plain language describes what is prohibited: bulletproof vests. The generally understood meaning of "bulletproof" is "impenetrable to bullets." (Webster's 3d New Internat. Dict. (1966) p. 294, col. 1.) "Bulletproof vest" is a commonly used term that would be readily understood by an ordinary person to refer to a garment that is intended to provide protection from gunfire. "`"The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding." [Citation.]'" (People v. Sullivan, supra, 151 Cal.App.4th at p. 543.) The terms of a statute are not impermissibly vague "`if their meaning can be objectively ascertained by reference to common experiences of mankind.'" (Id. at p. 544.) Such is the case here: an ordinary person, reading the plain statutory language prohibiting possession of "body armor," "popularly called a `bulletproof vest,'" could hardly be surprised to be prosecuted for possession of a *288 10-pound, camouflage-patterned vest like Saleem's, which bore a label stating it was "body armor." Because a reasonable and practical construction can be given to the term "bulletproof vest" in section 942, coupled with the term "body armor" in Penal Code section 12370, an ordinary person would necessarily be on notice of what conduct the statute proscribes.
Further, we must "give the statute a reasonable and commonsense interpretation consistent with the apparent purpose and intent of the lawmakers and resulting in wise policy rather than mischief or absurdity." (Anthony J. v. Superior Court, supra, 132 Cal.App.4th at p. 425; see also Smith v. Superior Court (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394, 137 P.3d 218]; People v. Ross (2008) 162 Cal.App.4th 1184, 1189 [76 Cal.Rptr.3d 477] [statute should not be interpreted in such a way as to defeat the legislative intent].) Surely, the Legislature did not intend to require the People to prove the defendant's knowledge of the technical specifications of the garment; such a requirement would impair effective enforcement of the statute. (See In re Jorge M., supra, 23 Cal.4th at pp. 884-885.) It would be a rare case in which the People could prove the violent felon's knowledge of the technical aspects of his or her body armor. Presumably, the Legislature did not intend to exempt persons convicted of violent felonies from the statute's purview merely because they failed to acquaint themselves with the garment's salient characteristics. (See In re Jorge M., supra, at p. 888.) As explained in regard to a similar issue in King: "To require the prosecution to prove that a defendant knows the precise length of a rifle prohibited by [Penal Code] section 12020(a) would make convictions for possessing such weapons virtually impossible to obtain, because few criminals would take the time to measure their rifles." (People v. King, supra, 38 Cal.4th at p. 628.) Imposing a requirement that the defendant have knowledge not only that the garment is a bulletproof vest, as that item is popularly known, but also of the garment's technical specifications, would likely render the statute nugatory. That clearly was not the Legislature's intent in enacting Penal Code section 12370.
One of the primary reasons for imposing a knowledge requirement is to avoid punishing innocent possession. For example, in People v. Coria, supra, 21 Cal.4th 868, our Supreme Court concluded that the crime of manufacturing methamphetamine requires that the defendant know the character of the substance being manufactured. (Id. at p. 871.) Coria explained that not all acts of chemical synthesis are illegal. (Id. at p. 880.) The court found it reasonably likely that the manufacturers of illicit drugs might employ naïve, unskilled helpers to assist in the manufacturing process. Therefore, requiring knowledge of the character of the substance would benefit innocent employees. (Id. at p. 881.) Similarly, King reasoned that many of the weapons prohibited by Penal Code section 12020, such as cane guns, belt buckle knives, baseball bats, and the like, "have an obvious lawful, utilitarian purpose, but because they are also disguised weapons, their possession is *289 illegal. . . . It is highly unlikely that the Legislature intended that a person possessing an item listed in [Penal Code] section 12020(a)(1) for its lawful, utilitarian purpose, but unaware of the characteristic that makes possession of the item illegal, would nevertheless be guilty of violating section 12020(a)(1). An example would be a person who borrows a cane for the legitimate purpose of using it as an aid in walking, unaware that a gun is hidden inside it. . . ." (People v. King, supra, 38 Cal.4th at p. 626, fn. omitted; accord, People v. Taylor, supra, 93 Cal.App.4th at p. 941 ["In order to protect against the significant possibility of punishing innocent possession by one who believes he or she simply has an ordinary cane, we infer the Legislature intended a scienter requirement of actual knowledge that the cane conceals a sword."].)
In the case of Penal Code section 12370, the goal of avoiding the punishment of innocent possessors is fully met by requiring proof that the defendant knew, or reasonably should have known, the garment in question was a bulletproof vest, as that phrase is generally understood. A bulletproof vest is a readily recognizable item, not easily mistaken for a regular vest or shirt. Unlike cane swords, chemical substances, and the like, the character of body armor is ordinarily obvious. Should technology progress to the point where body armor becomes difficult to distinguish from regular clothing, the knowledge requirement I have articulated would protect against the punishment of innocent possession. If, for example, the garment's appearance and attributes, and the defendant's manner of obtaining possession, did not reasonably suggest the garment was body armor, and no other evidence demonstrated knowledge, the requisite mens rea would be absent. (See In re Jorge M., supra, 23 Cal.4th at p. 886.)
This case finds a helpful parallel in Burg v. Municipal Court, supra, 35 Cal.3d 257. There the defendant was charged with violating Vehicle Code section 23152, subdivision (b), which prohibited driving with a blood-alcohol content of 0.10 percent or more. (Burg, at pp. 261, 264.) He contended the statute was void for vagueness because it failed to give adequate notice of the conduct it prohibited. (Id. at pp. 261, 268-271.) In particular, he urged that the statute was invalid because it was "impossible for ordinary persons actually to know when their blood alcohol reaches the proscribed point." (Id. at p. 270.)
Burg first concluded that the 0.10 percent blood-alcohol standard "could not be more precise as a standard for law enforcement," and thus assured the law would not be enforced arbitrarily. (Burg v. Municipal Court, supra, 35 Cal.3d at p. 270.) The court likewise rejected the defendant's argument that the statute failed to give fair notice of what conduct was prohibited. The court observed, "the real thrust of defendant's argument is that the statute is in *290 effect `void for preciseness.' His complaint is not that the language of the statute is vague or ambiguous, but that it is too exact. His novel theory is that the statute fails to notify potential violators of the condition it proscribes, because it is impossible for a person to determine by means of his senses whether his blood-alcohol level is a `legal' 0.09 percent or an `illegal' 0.10 percent." (Ibid.) Burg concluded that while this observation was true, it did not affect the statute's constitutionality. "Defendant's theory would render the void-for-vagueness doctrine internally inconsistent: the notice requirement would compete with the need to provide precise standards for law enforcement. When . . . a statutory standard requires scientific measurement, the very factor that assures due process under the `standards' component would violate due process under the `notice' component." (Ibid.) The "very fact that he has consumed a quantity of alcohol should notify a person of ordinary intelligence that he is in jeopardy of violating the statute." (Burg, at p. 271.) The court expressed skepticism that any person driving a vehicle after drinking would be "unaware of the possibility that his [or her] blood-alcohol level might equal or exceed the statutory standard." (Ibid.)
People v. King, supra, 38 Cal.4th 617, is also instructive. There, the defendant was charged with possession of a "short-barreled rifle." (Id. at p. 620.) King concluded that, although the prosecution was required to prove the defendant knew the rifle was short, it "need not prove the defendant's knowledge of the rifle's precise length." (Id. at p. 627.) The court reasoned that a "person possessing a short-barreled rifle, and having actually observed the weapon, necessarily knows of its shortness, and thus knows its illegal characteristic, whether or not the person knows how many inches long the weapon is." (Id. at pp. 627-628.)
As in Burg, Saleem's untenable argument is that the statute is too precise. As stated ante, the second definitional sentence of California Code of Regulations, title 11, section 942 contains a technical standard that serves to prevent arbitrary application of the law. The fact the statutory standard requires technical measurement and testing cannot undermine the "`fair notice'" component of the vagueness inquiry. (Burg v. Municipal Court, supra, 35 Cal.3d at p. 270.) Were the statute to employ a less precise definition of "body armor," defendants would likely contend it failed to provide concrete standards to avoid arbitrary enforcement. (See, e.g., Haggard v. State (Ind.Ct.App. 2002) 771 N.E.2d 668, 673-674 [defendant unsuccessfully contended nontechnical definition of "body armor" was void for vagueness]; U.S. v. Marler (N.D. Ohio 2005) 402 F.Supp.2d 852, 855-856 [same].) The two-sentence definition in section 942, however, avoids this problem by including both a technical, scientific definition and a commonsense, plain meaning definition readily accessible to a layperson. Further, analogous to Burg, the very fact a violent felon possesses an item that, for all practical purposes, appears to be a bulletproof vest, should notify the felon *291 that he or she is in danger of violating the statute. (See Burg v. Municipal Court, supra, at p. 271.) As with the short-barreled shotgun at issue in King, most, if not all, bulletproof vests are readily identifiable as such by one who observes or handles them.
I make one additional observation. Even if it were correct that a violent felon must know his body armor's technical specifications in order to have the requisite knowledge, it does not follow that Penal Code section 12370 is void for vagueness. The majority reasons that only an expert would know if a particular garment is proscribed by section 12370 (People v. Chapple, supra, 138 Cal.App.4th at p. 548); thus, a person of ordinary intelligence would have no reasonable way to discern whether a garment meets the technical requirements of California Code of Regulations, title 11. (Maj. opn., ante, at pp. 273-274.) I disagree. A defendant could purchase body armor from a seller who provides assurances that the garment has been certified for use by California peace officers, or meets the standards outlined in title 11. Certainly a felon who steals a body vest from a California peace officer or police cruiser could assume the garment meets the technical requirements of title 11. (See U.S. v. Marler, supra, 402 F.Supp.2d at pp. 853, 855-856.) A garment could bear labeling, or come with informational materials, stating that it meets the requirements for use by California peace officers or withstands penetration by particular types of ammunition. Under any of these scenarios, a defendant could rather easily possess the knowledge that his or her body armor meets California Code of Regulations, title 11's technical specifications. Indeed, a quick perusal of the numerous Internet sites which offer body armor for sale, including the online auction house eBay, reveals that much technical information is readily available to purchasers, including such things as the garment's National Institute of Justice level, the type of threats against which it will protect, and the police or military agencies that purportedly use it as standard equipment. Therefore at least some defendants could readily discern whether their body armor meets the technical requirements set forth in the regulations. How frequently such circumstances would occur, and whether the People would often, or ever, be able to prove them, is questionable. But the fact the People's burden would be difficult does not mean the statute is void; instead it means the statute would not be very effective. "`[A] party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that "the law is impermissibly vague in all of its applications." . . . [Citations.]'" (People v. Morgan, supra, 42 Cal.4th at pp. 605-606.)

d. Sufficiency of the evidence.

Applying the foregoing principles here, I conclude the evidence was sufficient to prove Saleem's vest constituted body armor and that he knew, or *292 reasonably should have known, it was prohibited body armor. When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidencethat is, evidence that is reasonable, credible and of solid valuefrom which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (People v. Snow (2003) 30 Cal.4th 43, 66 [132 Cal.Rptr.2d 271, 65 P.3d 749]; see People v. Halvorsen (2007) 42 Cal.4th 379, 419 [64 Cal.Rptr.3d 721, 165 P.3d 512].) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (People v. Medina (2009) 46 Cal.4th 913, 919 [95 Cal.Rptr.3d 202, 209 P.3d 105].)
As the majority correctly concludes, the evidence was sufficient to show Saleem's vest constituted body armor. (Maj. opn. ante, at p. 263.) The People were required to prove Saleem's vest would prevent complete penetration with the type of test ammunition specified for one or more types of armor. (Cal. Code Regs., tit. 11, § 942.) The regulations specify that Type I armor is to be tested with .38 special and .22 long rifle high velocity ammunition. (Cal. Code Regs., tit. 11, § 946, subd. (b)(1)(A), (B); see id., § 951 ["The front and rear ballistic panels of each armor type shall be tested with the type of ammunition specified in Section 946(b) for each armor type."].) Here, Officer Richard Kehr, who qualified as an expert in body armor, testified that he had examined Saleem's vest, including its weight, rigidity, and interior composition. Based on his examination, he believed the vest would stop certain rounds "without a problem," and would provide ballistic resistance to .22-caliber long rifle high velocity bullets and .38 special bullets. Further, Kehr testified that the vest would provide ballistic resistance to certain .357 Magnum and nine-millimeter bullets, the test rounds specified for Type IIA armor. The evidence was therefore sufficient to prove the vest was prohibited body armor within the meaning of Penal Code section 12370.
Likewise, the evidence was sufficient to show Saleem knew, or reasonably should have known, his vest was a bulletproof vest prohibited by the statute. As the majority agrees, there is no doubt Saleem knew he possessed a body vest: he was wearing it. (Maj. opn. ante, at p. 276.) The vest weighed 10 pounds, certainly an unusual attribute for a regular garment. Officer Jeffrey Rivera testified that he immediately recognized the vest as similar to those worn in the military, demonstrating that the vest was easily recognizable as body armor. The vest was expressly labeled "body armor." It bore a patch stating it was "[b]ody armor, fragmentation protection vest for ground troops." (Italics added.) A pamphlet behind the patch was entitled, "`The use and care of body armor fragmentation protective vest, ground troops.'" (Italics added.) Additionally, the jury could infer consciousness of guilt in Saleem's attempt to walk from the scene after he exited the Honda. (See *293 generally People v. Tripp (2007) 151 Cal.App.4th 951, 956 [60 Cal.Rptr.3d 534].) In my view, this circumstantial evidence was sufficient to prove Saleem knew his vest was a prohibited bulletproof vest.
The majority expresses concern that, based on the pamphlet found with the vest, Saleem would not have known it was capable of stopping bullets. The majority reasons that Saleem could not have known a military flak jacket designed to protect against shrapnel would protect against handgun ammunition, especially since the pamphlet stated the vest did not protect against small arms fire. Although the expert explained that in military parlance, small arms fire refers to machine guns and rifles, not handguns, the majority worries that Saleem, as a layperson, could not have known this. (Maj. opn., ante, at pp. 276-277.) I readily agree that this evidence, which was before the jury, could have led to an acquittal. The jury was instructed that, to convict, it must find Saleem "knew that he possessed BODY ARMOR." If the jury concluded that Saleem actually believed his vest was only a flak jacket that provided no protection from gunfire, the knowledge element would have been unmet, and acquittal would have been the result. In my view, this case is no different than any other in which the People and the defendant present conflicting evidence: resolution of such conflicts is for the jury, not this court. Evidence is not deemed insufficient merely because contrary evidence was also presented. Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. (People v. Young (2005) 34 Cal.4th 1149, 1181 [24 Cal.Rptr.3d 112, 105 P.3d 487].) "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" (People v. Maury (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1]; see People v. Young, supra, at p. 1181.)

e. Conclusion.

In sum, in my view, to prove a violation of Penal Code section 12370, the People must prove, generally via expert testimony, that the garment in question provides ballistic resistance to penetration from the types of ammunition specified in the regulations as the test ammunition for one or more types of armor. The People must further prove, by direct or circumstantial evidence, that the defendant knew he or she possessed, owned, or purchased the garment, and knew, or reasonably should have known, that the garment was body armor or a bulletproof vest as those terms are popularly understood. (See People v. King, supra, 38 Cal.4th at p. 627.) The People need not prove the defendant knew the technical specifications of the garment, or that it was *294 equivalent to the body armor certified for use by California peace officers. As a practical, commonsense matter, an ordinary person would understand, after reading Penal Code section 12370 and California Code of Regulations, title 11, section 942, what the statute prohibits. If a violent felon chooses to possess an item that appears to be body armor, and the People prove that the garment actually is body armor, i.e., withstands penetration by the relevant test ammunition, then there is no reason why the conviction should not stand. Mindful of our duty to uphold the constitutionality of a penal statute where possible (People v. Superior Court (Romero), supra, 13 Cal.4th at p. 509), I decline to frustrate the Legislature's purpose in enacting Penal Code section 12370. Accordingly, I would find the statute constitutional and affirm Saleem's conviction.
NOTES
[1] All further statutory references are to the Penal Code unless otherwise specified.
[2] By "IED" Kehr was presumably referring to the improvised explosive devices used by insurgents in the Iraq war.
[3] Section 946, subdivision (b) of California Code of Regulations, title 11, provides:

"(1) For Type I Armor:
"(A) The 38 SPL test bullets shall be LEAD R.N. (Remington #3854) with nominal mass of 10.2 grams (158 grains) and measured velocities of 259 + 6 m/s (850 + 21 ft.) per sec.
"(B) The 22 LRHV test bullet shall be LEAD R.N. with nominal mass of 2.6 grams (40 grains) and measured velocities of 320 + 8 m/s (1050 + 26 ft.) per sec.
"(2) For Type IIA Armor:
"(A) The 357 MAG test bullets shall be LEAD SWC or equivalent JSP (Remington #357M5), with nominal mass of 10.2 grams (158 grains) and measured velocities of 397 + 10 m (1300 + 33 ft.) per sec.
"(B) The 9 mm test bullets shall be FMJ (Remington #R9MM2) with nominal mass of 8 grams (124 grains) and with measured velocities of 336 + 9 m (1100 + 28 ft.) per sec.
"(3) For Type II Armor:
"(A) The 357 MAG test bullets shall be JSP (Remington #R57M3) with nominal masses of 10.2 grams (158 grains) and with measured velocities of 425 + 11 m/s (1395 + 35 ft.) per sec.
"(B) The 9 mm test bullets shall be FMJ (Remington R9MM2) with nominal masses of 8 grams (124 grains) and with measured velocities of 358 + 9 m/s (1175 + 30 ft.) per sec.
"(4) For Type III Armor: The 7.62 mm (308 Win) bullets shall be FJM (U.S. Government Issue) with a nominal mass of 9.7 grams (150 grains) and with measured velocities of 873 + 22 m/s (2863 + 72 ft.) per sec.
"(5) For Type IV Armor: The 30-06 bullet shall be AP (U.S. Government Issue) with a nominal mass of 10.8 grams (166 grains) and with measured velocities of 838 + 21 m/s (2750 + 69 ft.) per sec."
[4] Section 20 provides, "In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence."
[5] The legislative history provides no explanation for why, when it enacted section 12370, the Legislature did not either adopt the broad definition of "body vest" contained in section 12022.2, subdivision (c), or publish a list of the proscribed protective body vests by manufacturer and model number.
[6] Chapple did not, however, conclude an expert had to have tested the particular vest in question: "Because neither party contends [the police officer] was qualified as an expert in this case, there is no need to address the types of information an expert can rely on in order to provide the opinion required in a prosecution of this nature. The apparent assumption in the People's brief that a prosecution expert would be obligated `to scientifically test body armor in order to survive a preliminary hearing' is unfounded. The expert may, of course base an opinion on personal observation, including experiments conducted personally by him or her. But the Evidence Code also permits the expert to rely on `matter . . . made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates. . . .' (Evid. Code, § 801, subd. (b).)" (People v. Chapple, supra, 138 Cal.App.4th at p. 548, fn. 6.)
[7] The American Heritage Dictionary of the English Language (1973) defines "small arms" as "Firearms carried in the hand." Webster's Collegiate Dictionary (5th ed. 1946) defines "small arms" as "Arms carried on the person and used in the hands; now, generally, only portable firearms." The Merriam-Webster OnLine dictionary defines "small arm" as "a handheld firearm (as a handgun or shoulder arm)usually used in plural." [ [as of Dec. 17, 2009].)
[8] Saleem's jury was instructed: "Body armor is popularly called a bulletproof vest. As used in these instructions, body armor means those parts of a vest or garment that provides ballistic resistance to the penetration of any of the following ammunition:

"1. Handgun ammunition manufactured for commercial consumption in the calibers of
"(a) .22 caliber long rifle high velocity, or
"(b) .38 special, or
"(c) .357 magnum, or
"(d) nine millimeter, or
"2. Rifle ammunition manufactured for commercial consumption in the calibers of:
"(a) 7.62 millimeter or
"(b) 30 odd six."
[9] Given this result, we need not reach Saleem's contentions there was insufficient evidence he knew he was wearing illegal body armor, and that the trial court failed to properly instruct the jury on the definition of body armor.
[1] Subdivision (b) of Penal Code section 12370 allows the police chief or sheriff in the applicable jurisdiction to grant an exception to the statute's prohibition when the ex-felon's employment, livelihood, or safety depends upon his or her ability to legally possess and use body armor.
[2] California Code of Regulations, title 11, section 942, subdivision (e), also states: "In certain models, the body armor consists of ballistic panels without a carrier. Other models have a carrier from which the ballistic panels may be removed for cleaning or replacement." These aspects of the definition are not directly relevant to the issues presented on appeal.
[3] Where the statements of a bill's author appear to be part of the legislative debate and were communicated to other legislators, as was the case here, we may regard them as evidence of the legislative intent. (Carter v. California Dept. of Veterans Affairs (2006) 38 Cal.4th 914, 928 [44 Cal.Rptr.3d 223, 135 P.3d 637].)